UNITED STATES v. OREGON & C. R. CO.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1906.)

No. 1,213.

PUBLIC LANDS—CONSTRUCTION OF RAILROAD—GRANT—"PUBLIC LANDS" DE-FINED.

The grant made by the United States by Act July 25, 1866, c. 242, 14 Stat. 239, to aid in the construction of a railroad and telegraph line, from the Central Pacific Railroad in California to Portland in Oregon, of "every alternate section of public land, not mineral," within 20 miles on each side of said railroad line, with a provision for selection of lands in lieu of any of those within such primary limits, which should be found to have been occupied by homestead or pre-emption settlers or in any manner disposed of within 10 miles beyond such limits, was a grant in præsenti, and did not embrace land which was at the time of the passage of the act subject to a live homestead entry, although such entry was relinquished prior to the filing of the map of definite location and survey of any part of its road by the railroad company; such land not having been "public land," within the meaning of the grant.

Appeal from the Circuit Court of the United States for the District of Oregon.

See 133 Fed. 953.

This suit, which was one in equity, was brought to obtain a decree canceling a patent theretofore issued by the government to the Oregon & California Railroad Company, of certain lands within the primary limits of the grant made by Congress on the 25th day of July, 1866, by its act entitled: "An act granting lands to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad in California, to Portland, in Oregon." 14 Stat. 239, c. 242. The cause was submitted to the court below upon an agreed statement of facts, and, having resulted in a judgment for the defendant to the suit, is brought here for review by the government.

The stipulation of the parties is as follows:

"It is stipulated and agreed as follows:

"Item 1. The act of Congress approved July 25, 1866, entitled 'An act granting lands to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad in California, to Portland, in Oregon,' as printed in volume 14 of the United States Statutes at Large, on pages 239 and following, is admitted in evidence.

"Item 2. The Oregon Central Railroad Company is a corporation duly incorporated and organized on April 22, 1867, by and in virtue of the laws of the state of Oregon.

"Item 3. That the Legislature of the state of Oregon, by its joint resolution adopted October 20, 1868, duly designated the said Oregon Central Railroad Company as the company entitled to receive the lands granted in Oregon, and the benefits and privileges conferred by the act of Congress referred to in item 1 hereof; and prior to the year 1869 the said company duly became entitled to all the benefits, privileges, and grants in the state of Oregon, mentioned in or offered by the said act of Congress.

"Item 4. The act of Congress approved June 25, 1868, entitled 'an act to amend an act entitled "An act granting lands to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad, in California, to Portland, in Oregon,"' as printed in volume 15 of the United States Statutes at Large, on page 80, is admitted in evidence.

"Item 5. The act of Congress approved April 10, 1869, entitled 'An act to amend an act entitled "An act granting lands to aid in the construction of a railroad and telegraph line from the Central Pacific Railroad, in California, to Portland, in Oregon," approved July twenty-five, eighteen hundred and

sixty-six,' as printed in volume 16 of the United States Statutes at Large, on page 47, is admitted in evidence.

"Item 6. That on or about July 1, 1869, the said Oregon Central Railroad Company duly filed in the Department of the Interior its assent to the act of Congress referred to in item 1 hereof.

"Item 7. On October 29, 1869, the said Oregon Central Railroad Company filed in the office of the Secretary of the Interior, and on January 29, 1870, the Secretary of the Interior duly accepted and approved, a map of the definite location and survey of the first section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from Portland to a point at or near Jefferson, and comprised not less than 60 continuous miles from the northern terminus thereof.

"Item 8. On March 26, 1870, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on March 29, 1870, duly accepted and approved, maps of the definite location and survey of the second section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said point at or near Jefferson, to a point on the south line of township 27 south, range 6 west, Willamette meridian, and comprised not less than 120 continuous miles of railroad from Jefferson; on January 7, 1871, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on March 2, 1871, duly accepted and approved, a map of the definite location and survey of the third section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said point on the south line of township 27 south, range 6 west, to a point in section 30, in township 30 south, range 5 west; on April 6, 1882, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on April 8, 1882, duly accepted and approved, an amended map of the definite location and survey of the said third section of railroad, which amended line of railroad extended from station 1,154 in section 28, township 29 south, range 5 west, to station 1,320+50, in section 6, township 30 south, range 5 west; on April 6, 1882, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on April 8, 1882, duly accepted and approved, a map of the definite location and survey of the fourth section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said station 1,320+50 in section 6, township 30 south, range 5 west, to station 2,376+50 in township 31 south, range 7 west; on August 24, 1882, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on September 7, 1882, duly accepted and approved, a map of the definite location and survey of the fifth section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said station 2,376+50 in township 31 south, range 7 west, to the north line of section 33, township 34 south, range 6 west; on June 6, 1883, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on that day duly accepted and approved, a map of the definite location and survey of the sixth section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said north line of section 33, township 34 south, range 6 west, to the east line of section 21, township 36 south, range 3 west; on July 3, 1883, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on July 6, 1883, duly accepted and approved, a map of the definite location and survey of the seventh section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said east line of section 21, township 36 south, range 3 west, to the south line of section 32, township 37 south, range 1 west; on September 4, 1883, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on that day duly accepted and approved, a map of the definite location and survey of the eighth section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the south line of section 32, township 37 south, range 1 west, to the east line of section 25, township 39 south, range 1

west; on August 1, 1883, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on that day duly accepted and approved, a map of the definite location and survey of the ninth section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said point on the east line of section 25, township 39 south, range 1 east, to the north line of section 30, township 40 south, range 2 east; and on August 18, 1884, the defendant filed in the office of the Secretary of the Interior, and the Secretary of the Interior on that day duly accepted and approved, a map of the definite location and survey of the tenth section of the railroad in Oregon provided for by the said act of July 25, 1866, which section of railroad extended from the said point on the north line of section 30, township 40 south, range 2 east, to the southern line of the state of Oregon, in section 13, township 41 south, range 1 east.

"Item 9. The Commissioner of the General Land Office, under the direction of the Secretary of the Interior, withdrew all odd-numbered sections of land within 30 miles on each side of the line of railroad shown on the maps set forth and described in item 8 hereof, from sale or location, pre-emption or homestead entry, on the following dates: Opposite, and coterminous with, the said first section of railroad, on January 31, 1870; opposite, and coterminous with, the said second section of railroad, on April 7, 1870; opposite, and coterminous with, the said third section of railroad, on March 31, 1871; opposite, and coterminous with, the said amended section of railroad, on July 5, 1883; opposite, and coterminous with, the said fourth section of railroad, on July 5, 1883; opposite, and coterminous with, the said fifth section of railroad, on July 5, 1883; opposite, and coterminous with, the said sixth section of railroad, on July 5, 1883; opposite, and coterminous with, the said seventh section of railroad, on September 3, 1883; opposite, and coterminous with, the said eighth section of railroad, on October 27, 1883; opposite, and coterminous with, the said ninth section of railroad, on October 27, 1883; and opposite, and coterminous with, the said tenth section of railroad, on December 19, 1884. And the said withdrawals by the commissioner have, each and all, remained in full force and effect from the date thereof continuously, to and including the present time, except in so far as, if at all, they have been affected by an order by the Secretary of the Interior, made on August 15, 1887, declaring said withdrawals revoked as to the odd-numbered sections within the indemnity limits of the grant made by the said act of July 25, 1866.

"Item 10. The entire railroad contemplated and provided for by the said act of July 25, 1866, along the line shown on the maps set forth and described in item 8 hereof, was constructed in several sections and fully equipped in all respects as required by the said act of July 25, 1866, by the said Oregon Central Railroad Company and this defendant; and commissioners, duly appointed by the President of the United States for that purpose, duly examined the said railroad as completed and equipped in the several sections aforesaid, and duly reported to the President of the United States, under oath, that each of said sections of railroad had been completed and equipped in all respects as required by the said act of Congress, and that the same was and were ready for the service contemplated by the said act, which reports were duly accepted and approved by the President of the United States. The said reports were so made, accepted, and approved, on the following dates: The first 20 miles, commencing at Portland, report made on December 31, 1869, accepted and approved on January 29, 1870; the second 20 miles, report made on September 28, 1870, accepted and approved on February 28, 1871; third 20 miles and fourth 20 miles, report made on December 10, 1870, accepted and approved on February 28, 1871; fifth 20 miles, report made on August 11, (1871), accepted and approved on March 11, 1872; sixth 20 miles, report made on January 13, 1872, accepted and approved on March 11, 1872; seventh, eighth, and ninth sections, including the last 78 miles of the said railroad from Portland to Roseburg, report made on July 10, 1878, accepted and approved July 11, 1878; from Roseburg to the south boundary line of Oregon, in several sections, reports

made and approved as the railroad was completed and examined in sections, during the years 1878 to 1899.

"Item 11. The E. ½ of S. W. ¼ and W. ½ of S. E. ¼ of section 21, township 1 south, range 3 east, Willamette meridian, are parts of an odd-numbered section of unoffered land within the primary limits of the grant made by the said act of July 25, 1866, and are opposite and coterminous with that section of the defendant's railroad, the map of definite location and survey of which was filed with the Secretary of the Interior on October 29, 1869, and approved by the Secretary of the Interior on January 29, 1870. (a) On March 3, 1865, one Michael Kelley filed his homestead claim No. 256, in the proper land office of the United States, for the said land, and on November 21, 1867, he (the said Michael Kelley) filed in the same land office his relinquishment unto the United States of the land and homestead claim, which homestead filing and the relinquishment thereof have ever since remained of record in the said land office; but final proof or payment was never tendered nor made under or in pursuance of the said filing. (b) On June 18, 1877, the proper officers of the United States issued a patent, in due form, purporting to convey the said land unto the defendant as part and portion of the lands granted by the said act of July 25, 1866, which patent was duly and properly issued, unless the homestead filing of Michael Kelley, hereinbefore set forth, excepted the said land from the lands granted by the said act of July 25, 1866. (c) On February 28, 1891, by deed bearing that date, the defendant sold and conveyed the N. E. ¼ of S. W.¼ and N. W. ¼ of S. E. ¼ of the said section 21, unto Andrew D. Gibbs, for the sum of $267.20 in hand paid; on February 4, 1895, by deed bearing that date, the defendant sold and conveyed the S. E. ¼ of S. W. ¼ of the said section 21, unto Mrs. S. E. Sumner Kline, for the sum of $200 in hand paid; and on February 28, 1891, by deed bearing that date, the defendant sold and conveyed the S. W. ¼ of the S. E. ¼ of the said section 21, unto A. Walter Scott, for the sum of $200 in hand paid. That each of the said purchases and sales were made in good faith, for full value of the land, without notice to the said purchasers, or any of them, other than such presumptive notice as is given by law, of the existence of the said homestead filing, or record thereof.

"Item 12. The grant made by the said act of July 25, 1866, is in course of adjustment by the Secretary of the Interior, and the proper officers of the United States, but has not been finally adjusted; and, including all the lands described in the bill of complaint herein, the defendant has not received the full quantity of land promised in the grant by the said act of July 25, 1866.

"Item 13. It is further agreed that this stipulation is, and shall always be deemed, conclusive evidence, for the purposes of this suit, of the truth of all the matters and things in it stipulated and agreed to be true as fully and effectually as if each and all of such matters and things were or had been conclusively proven by the introduction and the testimony of witnesses; but each party reserves the right to introduce further and additional testimony and evidence.

"Dated and signed on October 6, 1902.

"John H. Hall,
"United States Attorney for Oregon.
"Wm. D. Fenton and
"Wm. Singer, Jr.,
"Attorneys for the Defendant.
"H. M. Hoyt,
"Acting U. S. Attorney General."

Francis J. Heney, U. S. Atty.

William D. Fenton, and William Singer, Jr., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It will be seen from the foregoing statement that Kelley filed his homestead claim to the land in question in the proper land office on the 2d day of March, 1865, and did not file his relinquishment thereof until November 21, 1867. The question in the case is not whether Congress had the power, during the life of that claim, to make other disposition of the land, for such power on its part, at any time prior to the time when, under the provisions of the homestead law, Kelley's right should become absolute, may readily be conceded. The real question here is: Did Congress undertake to exercise such power by its act of July 25, 1866? the granting clause of which is as follows:

"Sec. 2. And be it further enacted, that there be, and hereby is, granted to the said companies, their successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the line of said railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of said railroad line; and when any of said alternate sections or parts of sections shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, other lands, designated as aforesaid, shall be selected by said companies in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections designated by odd numbers as aforesaid, nearest to and not more than ten miles beyond the limits of said first-named alternate sections; and as soon as the said companies, or either of them, shall file in the office of the Secretary of the Interior a map of the survey of said railroad, or any portion thereof, not less than sixty continuous miles from either terminus, the Secretary of the Interior shall withdraw from sale public lands herein granted on each side of said railroad, so far as located and within the limits before specified. The lands herein granted shall be applied to the building of said road within the States, respectively, wherein they are situated. And the sections and parts of sections of land which shall remain in the United States within the limits of the aforesaid grant, shall not be sold for less than double the minimum price of public lands when sold: Provided, that bona fide and actual settlers under the pre-emption laws of the United States may, after due proof of settlement, improvement, and occupation, as now provided by law, purchase the same at the price fixed for said lands at the date of such settlement, improvement, and occupation: And provided, also, that settlers under the provisions of the homestead act, who comply with the terms and requirements of said act, shall be entitled, within the limits of said grant, to patents for an amount not exceeding eighty acres of the land so reserved by the United States, anything in this act to the contrary notwithstanding."

What Congress granted by that act, and all that the appellee could acquire thereby, were certain sections of the "public land." If the quarter section in question was then public land, the judgment of the court below was right, for it is agreed by the parties that it is embraced within the primary limits of the grant under which the appellee claims, and was freed of the homestead claim by Kelley's relinquishment thereof before the time of the definite location of the appellee's road. Northern Pacific Railway v. De Lacey, 174 U. S. 622, 19 Sup. Ct. 791, 43 L. Ed. 1111. The grant in question is one in præsenti, and embraced only such lands as were "public land" at the time of the grant. That is manifest from the positive and affirmative words of the grant above quoted; and that it did not embrace any land to which there was then a valid homestead claim is further shown by the concluding provision of section 2 declaring:

143 F.—49

"That settlers under the provisions of the homestead act who comply with the terms and requirements of said act, shall be entitled, within the limits of said grant, to patents for an amount not exceeding eighty acres of the land so reserved by the United States, anything in this act to the contrary notwithstanding."

The agreed statement of facts shows that at the time of this grant by Congress there was on file in the proper land office an existing homestead claim thereto by Kelley, which could have ripened into a perfect title in him to the extent of any 80 acres thereof, by his compliance with the provisions of law in relation thereto.

In speaking of the act of Congress of July 2, 1864, c. 217, 13 Stat. 365, granting to the Northern Pacific Railroad Company certain sections of public land within certain defined limits, this court said, in the case of Amacker v. Northern Pacific Railroad Company, 15 U. S. App. 279, 282, 58 Fed. 850, 851, 7 C. C. A. 518, 541:

"The character of the grant to the company is well defined. It is one in præsenti, but, as was said in St. Paul & Pacific Railroad Company v. Northern Pacific Railroad Company, 139 U. S. 1, 5, 11 Sup. Ct. 389, 390, 35 L. Ed. 77: 'The grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but, when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved.' In considering, therefore, what lands ultimately passed by the grant, there are two periods principally to be regarded; one the date of the granting act, the other the filing of the map of definite location of the road. Lands to which claims had attached at either period do not pass, though they were free from the claim at the other period. In Bardon v. Northern Pacific Railroad Company, 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806, a pre-emption claim existed at the date of the granting act, which, however, had been abandoned before the map of definite location was filed. It was held that it was not included in the grant. See, also, Hastings & Dakota Railroad Company v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363. In Kansas Pacific Railway Company v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122, a homestead entry was made after the date of the grant, but before the filing of the map of definite location, and it was held that the land was excepted from the grant."

The land in controversy in the case of Northern Pacific Railroad Company v. De Lacey, 174 U. S. 622, 19 Sup. Ct. 791, 43 L. Ed. 1111, was within the primary limits of both the grant made by Congress to the Northern Pacific Railroad Company July 2, 1864 (13 Stat. 365, c. 217) and the grant made by the joint resolution of May 31, 1870 (16 Stat. 378). The grant in the act of July 2, 1864, was of "every alternate section of public land not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office," etc. In that case it was contended that the land there in question was excepted from both of those grants because one John Flett had, on the 9th day of April, 1869, filed

in the local land office a statement declaring his intention to purchase the land under the laws of the United States authorizing the pre-emption of unoffered land, which claim remained uncanceled at the time of the definite location of the company's line of road. The Supreme Court held that, inasmuch as that claim of Flett filed on the 9th day of April, 1869, in the local land office, was alive at the time of the adoption of the resolution of May 31, 1870, the land was excepted from the operation of the grant contained in that resolution, but that, inasmuch as the right of Flett, under whom De Lacey claimed, was a right of pre-emption only, which ceased at the expiration of 30 months from the filing of his statement on the 9th day of April, 1869, in the local land office, because of the failure to make proof and payment within the time required by statute, there was no existing claim to the land at the time of the definite location of the company's line of road, which was March 26, 1884, and therefore the land passed to the company under the grant of July 2, 1864; but the court said:

"If there had been a pre-emption claim at the time of the passage of the act of 1864, the land would not have passed under that grant." 174 U. S. 626, 19 Sup. Ct. 793, 43 L. Ed. 1111.

In view of the facts of that case, we do not think we would be justified in treating this utterance of the Supreme Court as obiter dictum, as the appellee contends that we should do. Giving it effect, and applying it to the facts of the present case, it is plain that the land in question was not embraced by the grant under which the appellee claims. Besides, we think the clause last quoted is in precise accord with the numerous decisions of the same court to the effect that no land is "public land," within the meaning of such grants, to which there is at the time of the making thereof a live claim on the part of an individual under the homestead or pre-emption law, which has been recognized by the officers of the government, and has not ceased to be an existing claim. Cases supra, and Whitney v. Taylor, 158 U. S. 85, 94, 15 Sup. Ct. 796, 39 L. Ed. 906; Doolan v. Carr, 125 U. S. 618, 638, 8 Sup. Ct. 1228, 31 L. Ed. 844; Monroe Cattle Co. v. Becker, 147 U. S. 57, 13 Sup. Ct. 217, 37 L. Ed. 72; Leavenworth, etc., R. R. v. United States, 92 U. S. 733, 23 L. Ed. 634; Wilcox v. Jackson, 13 Pet. 498, 10 L. Ed. 264.

The judgment is reversed, and the cause remanded to the court below, with directions to enter judgment for the complainant as prayed for.